IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CARRIE L. THOM,

                Plaintiff,               10-CV-3069-ST

      v.                        OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.
_____

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Carrie L. Thom ("Thom"), seeks judicial review of the final decision by the

Social Security Commissioner ("Commissioner") denying her application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 USC §§ 401-33.

This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g)

and § 1383(c)(3).

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons set forth below, the Commissioner's decision is reversed and remanded.

## ADMINISTRATIVE HISTORY

Thom first applied for SSI on December 21, 2005, alleging a disability since January 1, 1993,[1] due to depression, anxiety, and schizophrenia.  Tr. 100-02, 109.[2]  After her application was denied on April 25, 2006, Thom requested reconsideration.  Tr. 76-81.  Her request for reconsideration was denied on October 27, 2006, and she then timely requested a hearing. Tr. 82-85.  A hearing was held on June 19, 2008, before Administrative Law Judge ("ALJ") Jean Kingrey.  Tr. 41-73.

On July 24, 2008, the ALJ found that Thom was not entitled to SSI since December 21, 2005, the date her application was filed.  Tr. 29-40.  The Appeals Council denied Thom's request for review of the ALJ's decision.  Tr. 1-3.  The Appeals Council decision is a final decision of the Commissioner, subject to review by this court.  20 CFR § 410.670a.

## BACKGROUND

Thom obtained her GED in 1993 and was age 35 at the time of the hearing.  Tr. 100, 189. She worked sporadically and briefly at different jobs until November 30, 2002.  Tr. 110, 190. Thom claims that her mental illnesses have limited her ability to work due to anxiety and hearing

---

[1]  The ALJ noted that Thom had previously filed for Title XVI benefits.  That application was initially denied on July 31, 2003, and again on reconsideration on December 26, 2003.  Tr. 29.  This court's decision does not reopen any prior application.  Eligibility is thus evaluated after the December 21, 2005 application date.

[2]  Citations are to the pages indicated in the official transcript of the administrative record filed on December 7, 2010 (docket #15).

voices.  Tr. 109.  She indicates that her anxiety and psychotic thoughts increased in May 2006

and that her insecurities and hearing of voices increased in September 2006.  Tr. 150, 178.

**I.  Medical Evidence**

    **A.  Treating Physician**

    Jim Nordal, M.D., Thom's primary care physician, began treating her as early as October

2003 for depression, anxiety, and schizophrenia.  Tr. 272.  In December 2003, when discussing a

switch from Zoloft (antidepressant) to Prozac (antidepressant) and weight gain from Zyprexa

(used to treat schizophrenia), he noted that she was a "fairly complex psychiatric patient" and had

not shown up for past psychiatric evaluations scheduled at Josephine County Mental Health

("JCMH").  *Id*.  He observed that "she relates well to the examiner, no flight of ideas, loose

associations, or perseverations." *Id*.

    On April 6, 2004, Thom reported to Dr. Nordal that she was not taking the Zyprexa, but

was taking clonazepman and "seems to be quite stable."  Tr. 270.

    On May 7, 2004, she asked Dr. Nordal for Antabuse to treat her alcoholism.  Tr. 269.

She explained that she planned to begin a job program and wanted the prescription to help her

avoid temptation.  *Id*.  On May 24, 2004, after a recent hospitalization for a suicide gesture,

Thom again saw Dr. Nordal, reporting auditory hallucinations and a "psychotic break."  Tr. 268.

She received Haldol (antipsychotic) at the hospital and found it helpful, but Dr. Nordal chose to

prescribe the newer Abilify "since it is supposed to have less weight gain effects than the

Zyprexa."  *Id*.

During visits on September 8 and 22, 2004, Thom requested medical help for alcohol cessation. Tr. 264-65. She also independently contacted an outpatient treatment program and enrolled herself. Tr. 264.

Thom saw Dr. Nordal in December 2004, February, June, October and December 2005 for other complaints unrelated to auditory hallucinations. Tr. 258-62. On December 21, 2005, she asked to start a selective serotonin reuptake inhibitor ("SSRI") and Haldol. Tr. 257. Dr. Nordal reported that though she had been evaluated by a psychiatrist at JCMH, "they have basically handed off medication management to me as they lack available resources to provide prescription coverage for their patients." *Id*. He started her on Prozac, Haldol, and Cogentin (anticholinergic to treat the side effects of antipsychotic treatment). *Id*.

Dr. Nordal continued to treat her throughout 2006 for a variety of ailments. Tr. 253-56. He prescribed Seroquel (used to treat schizophrenia), in addition to her other medications, beginning in August 21, 2006. Tr. 253. On October 16, 2006, he saw Thom to remove sutures following her emergency room visit for cutting herself. Tr. 321. He noted that although she denied being suicidal, she left the hospital before she was assessed by mental health staff. *Id*. Dr. Nordal saw Thom again on November 21, 2006, when she complained about emotional lability and again prescribed on Prozac. Tr. 320.

Dr. Nordal again saw Thom in January, May, June and August 2007 for respiratory and digestive issues, but made no mention of any auditory hallucinations or mental health symptoms. Tr. 312-17. Nonetheless, his records indicate that she continued to take Seroquel and Prozac during this time. *Id.*

///

**B.  Emergency Room Visits**

On April 1, 2004, Thom was seen in the hospital emergency room after being struck in the head with a beer bottle.  Tr. 225-26.  She reported she had been drinking all day with friends and was diagnosed with acute enthanol intoxication.  *Id*.

On May 13, 2004, Thom called the paramedics and was taken to the hospital where she was diagnosed with suicidal gesture, alcoholism and polysubstance abuse.  Tr. 195.  Though she denied use of amphetamines, her test results were positive.  *Id*.  Elise Fulsang, M.D., noted that, based on an interview by a mental health evaluator, "she presented with suicidal gestures that, on further description, appear to be really just emotional lability. . . . Her biggest problem appears to be alcoholism and domestic violence."  *Id*.

On February 17, 2006, Thom was seen in the emergency room for a left arm fracture after falling out of a moving pickup truck.  Tr. 220-21.  Thom reported that she drank one case of alcohol a week.  Tr. 220.  Upon being discharged, Thoms' friend and the driver of the vehicle were arrested for various violations, including DUI.  Tr. 221.

On October 4, 2006, Thom visited the emergency room again after cutting her right wrist. Tr. 321.  She had been drinking alcohol and denied being suicidal.  Tr. 303.

## II.  Mental Health Evaluations

**A.  Dr. Greene**

Kathryn Greene, Psy D, LCSW, completed a comprehensive psychological evaluation of Thom on October 27 and November 6, 2003.  Tr. 188-94.  As part of her evaluation, she interviewed Thom, her boyfriend and mother, administered tests, and reviewed a previous psychiatric evaluation dated July 24, 2003, by Michael Sasser, MD.  Tr. 188.  Dr. Greene

reported that Thom has been hearing voices since 1994 and self-reported other delusional

thinking, experiences, and symptoms.  *Id*.  Test results indicated that Thom was easily distracted

and had difficulty with attention and concentration, had "marked" psychotic features and suicidal

thinking, and "screened positive" for depression and social anxiety but negative for alcohol

dependence and panic attacks.  Tr. 192.  She also "endorsed items indicative of symptoms of

hallucinations and thought control, disordered mode of thinking, hostility and suspiciousness,

and a persistent fear response that is irrational and disproportionate to the stimulus and which

have lead [*sic*] to avoidance and escape behaviors."  *Id*.

Dr. Greene observed that during the third hour of the consultation, Thom had "trouble

concentrating" and appeared to "emotionally decompensate and exhibit a period of dissociation

during testing.  The neurobehavioral assessment could not be [completed] because of her

intrusive thoughts and her inability to get back on task following a simple memory task."  *Id*.

She summarized her findings as follows:

> Carrie suffers from delusions and hallucinations that significantly interfere
> in her day-to-day activities.  Carrie's symptoms become worse with fatigue
> and prolonged stress and anxiety.  Carrie was able to remain in touch with
> reality during the first 2 hours of the evaluation with only mild indication
> of loose associations.  However, with more in depth interviewing and
> testing, she was noted to rapidly decline.  Discussion of symptoms and
> past history, testing stimuli and completing forms during her 3 hour
> assessment was enough to trigger her emotional instability.  She was
> observed to exhibit disorganized thinking (loose associations) that was
> severe enough to impair communication and trigger agitation. Carrie
> exhibited a period of incoherence and disorganized speech to a point
> where the testing needed to be abandoned to reduce tension and to bring
> her back to reality.

Tr. 193.

6 - OPINION AND ORDER

In addition, Dr. Greene noted that Thom's "social anxiety is also clearly disabling in her day-to-day activities and may include PTSD symptoms where environmental stimulation triggers her anxiety attacks." Tr. 194. She Greene gave Thom a Global Assessment ("GAF") score of 41.[3] Tr. 194.

Dr. Greene again evaluated Thom on November 30, 2006, on a referral from a disability liaison at DHS Rouge Valley Family Center. Tr. 293-95. Thom reported that her symptoms had not changed over the past three years and that she was experiencing anxiety, panic attacks and depression, and hearing voices daily. Tr. 293. Thom's boyfriend reported that she has "gotten worse over the years" with more frequent and violent mood swings, occurring up to four times a week. Tr. 293-94. Thom also reported that she had attempted two jobs, lasting between one to two weeks set up for her through the welfare department, but was unable to keep them because of her anxiety and the voices yelling in her head. Tr. 295. Dr. Greene concluded that Thom "has not changed much from our last evaluation in November of 2003" and that her symptoms, including hallucinations and depression, were "consistently pervasive in all areas of her life" and that "her paranoia and social anxiety are problematic." *Id*. She considered her prognosis to be "poor." *Id*.

In a Mental Residual Function Capacity Report completed December 8, 2006, Dr. Greene rated Thom as "markedly limited" in her ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions,

---

[3] The GAF is a scale from 1-100, in ten point increments, used by clinicians to determine the individual's current overall functioning. A GAF between 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed 2000).

maintain attention and concentration, perform activities within a schedule, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted, make simple work related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism, get along with co-workers or peers, maintain socially appropriate behavior, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. Tr. 296-97. She diagnosed Thom with schizophrenia and a panic disorder with a poor prognosis.

### B. **Ms. Cook**

On September 1, 2005, Jill Cook, MH, LMFT, a mental health specialist at JCMH, performed an Adult Comprehensive Mental Health Assessment of Thom. Tr. 205-09. Thom had been referred by DHS for counseling and treatment "due to her inability to consistently work" because of her anxiety, panic disorder, and auditory hallucinations. Tr. 205, 207. As did Dr. Greene, Ms. Cook assessed a GAF score of 41. Tr. 207. She also noted that Thom was "in full remission of methamphetamine use," but continued to use alcohol to "quiet the voices." *Id*. She has participated in four addictive treatment programs and sought "appropriate medication to quiet the voices." Tr. 207-08. Ms. Cook concluded that drug and alcohol treatment would be appropriate, but that Thom "has not been able to consistently make her appointments. This could be an issue in consistent, ongoing treatment. Her prognosis is fair, looking at her past history of starting and stopping therapy. If she could get effective treatment for the voices, it would be most helpful to her." Tr. 208.

///

### C. State Agency Medical Consultants

On April 12, 2006, Dorothy Anderson, PhD, a state agency medical consultant, based on a review of the medical records, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form. Tr. 229-45. She found that Thom:

> has the ability to understand, remember and carry out short, simple, routine work related tasks with sustained concentration, persistence and pace. [She] has the ability to interact appropriately with coworkers and supervisors, but should have only minimal contact with the general public due to intermittent symptoms of anxiety and depression. [She] would perform work related activities best that do not require input from others to complete tasks. In addition, [she] should not be require[d] to handle hazardous situations that could be harmful to self or others due to ongoing alcohol dependence and history of meth dependence.

Tr. 245.

Dr. Anderson concluded that Thom does have some mental problems "that would limit some mental work related activities but not to the degree reported" and that her "statement of limitations appear partially credible." Tr. 241. She she gave Thom a GAF of 45. *Id.*

Frank Laham, PhD, also a state agency consultant, reviewed the record and agreed with Dr. Anderson, noting that Thom's:

> statements of worsening anxiety and hallucinations since 5/06, as well as [letter] from friend describing her anxiety is given only partial credibility as it is inconsistent with the objective medical evidence of improvement as well as claimant's statements to her PCP of abstinence and not needing antipsychotic meds, ability to distinguish between voices and reality.

Tr. 287

On October 24, 2006, Sharon Eder, MD, a state agency medical consultant, determined that Thom did not have any physical limitations. Tr. 286.

///

### D.  **Dr. Reed**

On October 28, 2008, Thom underwent a psychiatric evaluation by Craig Reed, MD, at JCMH.  Tr. 212-18.   Thom reported trying different medications for her symptoms, including Haldol, Risperdal (used to treat schizophrenia), Zyprexa, Paxil (antidepressant), Zoloft and Trazodone (antidepressant).  Tr. 214.  Dr. Reed's mental status examination found Thom to have speech of a "normal rate and volume," "coherent and goal directed thoughts," cognitive logic that is grossly intact, "no attention to internal stimuli during this interview," and "grossly euthymic" with low displayed anxiety.  Tr. 215-16.  He diagnosed Thom with anxiety disorder, panic disorder with agoraphobia, PTSD, social anxiety disorder, psychotic disorder NOS, schizophrenia paranoid type, schizo-affective disorder, alcohol dependence, and methamphetamine dependence in sustained full remission, and assessed a GAF of 45.  Tr. 217. Dr. Reed also noted that "[b]ecause of uncertainty regarding continuity of psychiatric service within the [JCMH], the patient, given free choice has elected to continue employing her primary care physician as the prescriber of her psychoactive medications."  *Id*.

### III.  **Testimony**

### A.  **Thom**

Thom testified at the hearing on June 19, 2008, that her condition worsened around December 2005 when she refiled her SSI application.  Tr. 46.  She was hearing voices that were loud and constant, making it difficult for her to focus on anything.  Tr. 46, 50.  She explained that the voices were "mean, really cruel."  Tr. 47.  She was taking Seroquel to control the voices, but it was not working very well.  *Id*.  When asked if she could perform simple jobs with the help of

her current medication, Thom replied:  "I usually think I can, but mom always tells me forget it because by the time I'm doing anything for her, she has to go back and do it."   Tr. 50.

### B.  Warnicke

Thom's friend, Robert Warnicke, provided a handwritten statement on July 30, 2006, and a third party report on August 10, 2006.  Tr. 121-22, 156.  He explained that Thom is afraid of people and consequently allows only him and few others around her, including her immediate family and boyfriend, but will go out for a doctor's appointment.  Tr. 121, 161.  He also noted that Thom does not have many daily activities and that her personal care is affected by her condition.  Tr. 156-57.  She does not handle stress well and has problems with voices and dreams.  Tr. 162.

### C.  Costello

Thom's mother, Janice Costello, testified at the hearing.  Based on her daily observations since 2005, she testified that Thom cannot stay on task, needs to take multiple breaks, and cannot read a recipe.  Tr. 60-61.  When she talks with her daughter, Thom will have "spaced off and hasn't heard a word" she has said.  Tr. 62.  The voices are extremely intrusive, and Thom cannot concentrate to finish anything.  *Id*.  Although Thom will drink alcohol when she visits Warnicke and other friends who live close by, she does not seem impaired.  Tr. 63-64.  She is not able to go grocery shopping by herself.  Tr. 65.  Ms. Costello was unaware, however, of Thom's positive test results for methamphetamine in May 2004.  *Id*.

### D.  Vocational Expert

The ALJ provided the following hypothetical to the Vocational Expert ("VE"),

> This individual has a GED education, she would be limited to medium work according to exertional limitations, although she would additionally need to have no hazardous work settings due to alcohol, and there should be no high levels of air pollutants due to asthma. She would need simple routine tasks. There should be no interaction with the general public and no team work.

Tr. 68.

The VE testified that with those limitations, none of Thom's past work would be suitable. Tr. 69-70. However, other jobs were available, including hand packager, seedling puller, and janitor. Tr. 70.

Thom's attorney asked the VE to clarify if an individual with the limitations set forth in Dr. Greene's evaluation would be able to perform the work. The VE concluded that a person with those limitations would not be competitively employable. Tr. 71.

## DISABILITY ANALYSIS

In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps. 20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 416.909, 416.920(a)(4)(ii). Absent a severe impairment, the claimant is not disabled. *Yuckert*, 482 US at 141.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 416.966.

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Thom has not engaged in any substantial gainful activity since December 21, 2005, the application date. Tr. 31.

At step two, the ALJ determined that Thom suffers from the severe impairments of alcohol dependency, borderline personality disorder, gastroesophageal reflux disease, psychotic disorder and depression disorder, and obesity. *Id*.

At step three, the ALJ concluded that Thom does not have an impairment or combination of impairments that meets or equals any of the listed impairments. *Id*. The ALJ found that Thom "has the RFC to perform medium work, as defined in 20 CFR [§] 416.967(c) and has additional limitations including no hazardous work settings due to alcohol; no high air pollutants due to asthma; she is limited to simple, routine tasks; there should be no interaction with the general public; and no teamwork endeavors." Tr. 32.

At step four, the ALJ found that Thom is unable to perform any of her past relevant work. Tr. 39. However, she concluded that Thom is able to perform other work that exists in significant numbers in the national economy as a hand packager, seedling puller, and janitor. Tr. 40. Accordingly, the ALJ concluded that Thom was not disabled at any time through the date of the decision. *Id*.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the

Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also*

*Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the

evidence are insignificant if the Commissioner's interpretation is a rational reading.

*Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

Thom argues that the Commissioner's decision should be reversed and remanded because

the ALJ erred by:  (1) improperly rejecting the opinions and ultimate conclusions of Thom's

medical providers concerning the severity of her impairments; (2) improperly substituting her

own opinion for that of Thom's medical providers; (3) improperly rejecting the lay witness

testimony of Thom's friend and mother; and (4) relying an incomplete hypothetical question to

the VE.

For the reasons that follow, this court concludes that the Commissioner's decision is not

supported by substantial evidence and contains legal errors.  Accordingly, the Commissioner's

decision is reversed and this case is remanded for an immediate award of benefits.

## I.  Credibility Determination

Although Thom did not specifically challenge the ALJ's credibility finding in her

"assignments of error," both parties have addressed this issue in their supporting memoranda.

Therefore, the court addresses it as well.

### A.  Legal Standards

Once a claimant shows an underlying impairment which may "reasonably be expected to

produce the pain or other symptoms alleged" and absent a finding of malingering, the ALJ must

provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter,* 504

F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's credibility

findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did

not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir

1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  The ALJ may

consider objective medical evidence and the claimant's treatment history, as well as the

claimant's daily activities, work record, and observations of physicians and third parties with

personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at 1284.  The ALJ

may additionally employ ordinary techniques of credibility evaluation, such as weighing

inconsistent statements regarding symptoms by the claimant.  *Id.*  The ALJ may not, however,

make a negative credibility finding "solely because" the claimant's symptom testimony "is not

substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F3d at 883.

### B.  ALJ's Credibility Analysis

The ALJ concluded that Thom's "statements concerning the intensity, persistence, and

limiting effects of [her] symptoms are not credible to the extent they were inconsistent with the"

RFC.  Tr. 33.  The ALJ found Thom's allegations of disability were "significantly undermined by

several factors," namely that:  (1) she stopped working in November 2002 due to a lay off, not

her alleged mental health symptoms; (2) her testimony as to two months of abstinence from

alcohol "was contradicted by her mother's testimony of alcohol consumption two to three weeks

earlier;"  (3) "her reports of anxiety when not at home are contrary to her extended visits with

friends;" (4) her report to Dr. Nordal that she was "stable and without need for anti-psychotic

medication." Tr. 38. The ALJ also commented that:

> [I]n spite of her alcohol abuse, [Thom] has demonstrated resolve
> by her commitment to enroll in a outpatient drug treatment
> program and at certain intervals refrain from alcohol use. This
> determination demonstrates a level of concentration and focus,
> contradicting the notion that she cannot persist or focus on a task in
> a work environment.

*Id*.

As a result, the ALJ concluded that Thom "has not established that her mental health

symptoms have persisted at an intensity or frequency so that she could not perform simple

routine tasks in a work environment." *Id*.

### 1. **Objective Medical Findings**

The ALJ erroneously asserted that according to Dr. Nordal's records, Thom was stable

and without need of antipsychotic medication. Instead, Dr. Nordal's records consistently report

Thom's problems with her mental health symptoms or make some note of her medications to

control these symptoms. On December 10, 2003, Thom visited Dr. Nordal requesting a change

in medication. While he observed that "[s]he relates well to the examiner, no flight of ideas,

loose associations, or perseverations," he also discussed with her the side effects of various anti-

psychotic medications and concluded that "she is a fairly complex psychiatric patient" and that

"input from a psychiatrist would be very appropriate." Tr. 272. After learning that Thom had

not shown up for previously scheduled psychiatric evaluations at JCMH, he expressed his hope

that if her medications were effective, then she would be more reliable and that he could get

some recommendations for "ongoing management of her complex mental illness." *Id*.

In an October 2005 visit for upper respiratory problems, Thom reported that the voices are "bothering her a little but she is not having much in the way of paranoia or psychotic delusions" and did not believe she needed any medication for it.   Tr. 259.   However, she was taking Prozac and Trazadone, and Dr. Nordal offered to initiate treatment for her schizophrenia which she declined.   *Id*.   Two months later in December 2005, she asked about resuming her medication.   Tr. 258.   Dr. Nordal noted that Thom had seen Dr. Reed who recommended that Thom be prescribed Haldol or Prozac and asked her to see Dr. Nordal.   *Id*.

From December 2006 to October 2007, Dr. Nordal did not record any complaints from Thom about hearing voices or having any mental health problems, but he still treated her for these conditions with medications.   In December 2006, during an appointment for upper respiratory symptoms, Dr. Nordal spent time "talking about the Prozac that she has recently started using and she has found it to be quite beneficial."   Tr. 318.   In January 2007, she was continuing her prescriptions of Prozac and Seroquel.   Tr. 317.   Medical records for May, June, August, and October 2007 reflect similar notes that she was still taking the same prescription medications.   Tr. 312-16.

The Commissioner also points to Dr. Reed's evaluation stating that Thom's cognitive logic and memory were intact, with coherent and goal-directed thoughts and no attention to internal stimuli despite her complaint of constant auditory hallucinations.   Tr. 35, 215-16. However, Dr. Reed also diagnosed Thom with anxiety disorder, PTSD, social anxiety disorder, and a psychotic disorder, as well as alcohol dependence and methamphetamine dependence in sustained full remission.  Tr. 217.   Moreover, as the ALJ noted, Dr. Reed recommended a trial of

antipsychotics for her psychotic symptoms.  Tr. 35-36, 217.  Thus, despite his comments about her mental status during the interview, Dr. Reed's diagnosis and recommendation support, rather than undermine, Thom's credibility.

"Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  *Warre v. Comm'r of Social Sec. Admin.*, 439 F3d 1001, 1006 (9th Cir 2006), *citing Brown v. Barnhart*, 390 F3d 535, 540 (8th Cir 2004), *Lovelace v. Bowen*, 813 F2d 55, 59 (5th Cir 1987), *Odle v. Heckler*, 707 F2d 439, 440 (9th Cir 1983) (affirming a denial of benefits and noting that the claimant's impairments were responsive to medication); 20 CFR § 41.929(c)(3).  However, the record does not show that Thom's mental impairments have has been effectively treated by medications.  Though Thom responded well to some medications at times, Dr. Nordal found her to be a "fairly complex psychiatric patient" and periodically changed her medications.  Tr. 272.  The ability of certain medications to intermittently help alleviate one or more symptoms is not the same as effectively controlling all multiple diagnosed mental disorders.  Moreover, as discussed next, Thom's mental condition impacted her ability to follow prescribed treatment.

### 2. <u>Following Prescribed Treatment</u>

Failure to follow a prescribed treatment may also undermine a plaintiff's credibility. "[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  SSR 96-7p at *7.  The Ninth Circuit has "particularly criticized the use of a lack of

treatment to reject mental complaints both because mental illness is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Regennitter v. Comm'r*, 166 F3d 1294, 1299-1300 (9th Cir 1999); *see Nguyen v. Chater*, 100 F3d 1462, 1464 (9th Cir 1996).

The medical records reveal that Thom has consistently sought treatment for her mental health problems and substance abuse, but has been inconsistent with attending appointments and completing programs. Several of Thom's medical providers commented that this failure could be attributed to her mental condition. As previously noted, in December 2003, Dr. Nordal commented that as her mental condition became more stable with medication, he hoped she would become "more reliable." Tr. 272. Thom did not begin Dr. Nordal's prescribed antipsychotic medication in February 2006, but explained that she was worried about losing her health insurance coverage and did not want to start and then have to re-stop the medication once they became effective. Tr. 256. Ms. Cook reported in September 2005 that while Thom had participated in four addiction treatment programs, she had not participated in any long-term psychotherapy and had not been able to consistently make her appointments. Tr. 208. She also explained that Thom "has the desire to change but until she finds an effective treatment to quiet the voices, it will be difficult." Tr. 206.

Given her mental health severe impairments of borderline personality disorder, psychotic disorder and depression disorder, Thom's failure to show up for psychiatric evaluations and complete treatment programs is not a clear and convincing reason to doubt her credibility.

///

### 3. <u>Daily Activities and Inconsistent Testimony</u>

The ALJ also concluded that Thom's daily activities and inconsistent testimony undermine her credibility. Among other factors, the ALJ may consider "inconsistencies either in claimant's testimony or between her testimony and her conduct," as well her daily activities and work record. *Thomas v. Barnhart*, 278 F3d 947, 958-59 (9th Cir 2002) (quotations omitted), *citing Light v. Social Sec. Admin*, 119 F3d 787, 792 (9th Cir 1997). However, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair v. Bowen*, 885 F2d 597, 603 (9th Cir 1989). "[I]f a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Id*.

Thom stated that she cannot work because her anxiety prevents her from leaving the house. Tr. 109 ("I can't even get into work because I have so much anxiety I can't leave the house. When I do go to work, I can't stay because I hear voices and have anxiety that cause me to leave. Some days I am so depressed I can't even get out of bed."). This statement was specific to her fear of leaving the house for the workplace, not leaving the house for other reasons, and is consistent with her diagnosis of severe anxiety and agoraphobia. Tr. 207. Dr. Greene explained that Thom's fears of going outside the house are related to concerns that others will judge her. Tr. 191. Warnicke also testified that Thom only allows a few friends and family around her. Tr. 161. There is no evidence that Thom spends a substantial part of her day in public or engaging in activities that are transferrable to the workplace. That Thom is able to

socialize with a small number of friends outside of the house is not inconsistent with the allegations of her anxiety about leaving the house to go to work or interact with the public.

The ALJ also relied on the fact that Thom stopped working because she was laid off and not because of her condition. However, as Thom argues, the lay off is not relevant because the VE determined that she had no past relevant work. Tr. 68.

The ALJ also relied on Thom's self-enrollment in a substance abuse treatment program and occasional abstinence from alcohol to "contradict the notion that she cannot persist and focus on a task in a work environment." Tr. 38. The fact that Thom enrolled in a program hardly reflects that she is capable of performing work tasks in a work environment, especially in light of other evidence that she is unable to consistently make appointments because of her condition.

Therefore, the record does not reflect any work activity or contradiction in Thom's testimony that provides a clear and convincing reason to doubt her credibility.

### 4. <u>Substance Abuse</u>

The ALJ also cites evidence of Thom's past substance abuse to find her not credible, stating that "[m]edical providers have referred to the claimant's significant problem as alcoholism, rather than active symptoms of psychotic behavior." Tr. 38. This statement is apparently based on a note by Dr. Fulsang, who noted on May 13, 2004, that Thom's "biggest problem appears to be alcoholism and domestic violence." Tr. 195.

The ALJ's reliance on Dr. Fulsang's opinion is misplaced as she only saw Thom once for an ER visit. Moreover, neither Thom's treating physician, Dr. Nordal, her examining physician, Dr. Greene, nor the other medical source, Ms. Cook, indicated that alcohol was a significant

factor in her mental health impairments, other than as a source of self-medication for those impairments.  Thus, the ALJ did not provide a clear and convincing reason to question Thom's credibility based on her alcohol use.

### 5.  Conclusion

According to the record, Thom was not stable even when using anti-psychotic medications; she was following her treatment plan to the point her mental illness permitted; her daily activities were not inconsistent with her allegations and did not include tasks that could be transferred into the workplace; and reliance on her alcohol abuse was improper.  Thus, the ALJ erred by failing to provide clear and convincing reasons to discount Thom's credibility.

## II.  Rejection of Treating Physician's Opinion

### A.  Legal Standard

The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id*; *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006).  Even if the opinion is contradicted by another physician, the ALJ may not reject it without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066; *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 600 (9th Cir 1999) ("When a nontreating physician's opinion contradicts that of the treating

physician – but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician – the opinion of the treating physician may be rejected only if the ALJ gives specific legitimate reasons for doing so that are based on substantial evidence in the record.") (internal quotations and citations omitted).

The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F3d at 1066 n2. However, it may serve as substantial evidence when it is supported by and consistent with other evidence in the record. *Morgan*, 169 F3d at 600.

### B.  Dr. Greene

The ALJ concluded that "no weight is given to Dr. Greene's opinions as they appear to merely reflect claimant's less than credible self-reports." Tr. 37.

As previously discussed, the ALJ did not provide clear and convincing reasons for finding Thom not credible. Moreover, Dr. Greene did not question Thom's credibility. "[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r*, 528 F3d 1194, 1199-1200 (9th Cir 2008) (internal citations and quotations omitted). Thus, Thom's lack of credibility is not a clear and convincing reason to reject Dr. Greene's opinion.

In addition, the ALJ found that Dr. Greene's assessments "bare [*sic*] a stark contrast to the assessment of Dr. Reed, who essentially found a normal mental status exam, and treatment records of Dr. Nordal." Tr. 37. This finding is inaccurate.

Dr. Reed did find that Thom's mental status was normal, but also diagnosed her with severe mental health disorders, assessed her with a GAF of 45, and recommended that she take antipsychotics.  Tr. 217.  Dr. Greene similarly diagnosed severe mental health disorders and assessed Thom with a GAF of 41, within the same range as Dr. Reed.  Tr. 295.

With respect to Dr. Nordal, the ALJ further explained that Thom "rarely complains of auditory hallucinations, anxiety, or depression" to Dr. Nordal and also reports when medication has been successful. Tr. 37.  Dr. Nordal's reports, however, also explain how Thom is a "complex psychiatric patient" and detail different attempts over time at medication management with antipsychotics and antidepressants. Tr. 252-84, 311-27.  There is no contradiction between his records and Dr. Greene's assessments..

The ALJ also discredits Dr. Greene because she failed to recognize Thom's "persistent use of alcohol" and "failed to assess what affect such condition has had on the claimant's ability to function."  Tr. 37.  In her December 2003 assessment, Dr. Greene diagnosed "alcohol abuse sustained partial remission" and "amphetamine abuse/dependence sustained full remission." Tr. 194.  Neither the substance abuse nor alcohol abuse stayed in remission.  About five months later on May 13, 2004, Thom tested positive for methamphetamine and Dr. Fulsang concluded that her biggest problem "appears to be alcoholism and domestic violence."  Tr. 195.  The record also noted that she had prior visits to the hospital for alcoholism related problems.  Tr. 196.  At a follow-up appointment, Dr. Nordal noted Thom's substance abuse, but also discussed potential changes in treatment for her mental health conditions.  Tr. 268.

The ALJ apparently believes that Dr. Greene should have known that Thom would relapse in the future. However, the record does not contain substantial evidence to support that speculation. Dr. Greene's failure to anticipate Thom's relapse months later is neither a clear and convincing nor a specific and legitimate reason to reject her opinions.

### C. **Dr. Reed**

Thom disagrees with the ALJ's summary of Dr. Reed's evaluation that Thom had an "essentially normal mental status exam" and argues the ALJ failed to address Dr. Reed's ultimate conclusions. However, the ALJ correctly summarized Dr. Reed's "mental status examination" portion of his evaluation and was entitled to rely on it. Tr. 35, 215-16. In addition, the ALJ correctly described Dr. Reed's diagnosis. Tr. 35, 217. The problem is that the ALJ, although not expressly rejecting that diagnosis, added that it was "based on claimant's self reports." Tr. 35. Given that the ALJ later found Thom not to be credible and rejected Dr. Greene's opinion in part based on Dr. Reed's contrasting assessment, she apparently either implicitly rejected Dr. Reed's diagnosis or concluded that all of Thom's mental health impairments were adequately controlled by medication. For the reasons discussed above, either conclusion is erroneous.

## III. **Rejection of "Other Source" Testimony**

### A. **Legal Standard**

An ALJ must give germane reasons for rejecting lay witness testimony. *Nguyen*, 100 F3d at 1467. A lay witness cannot establish a medical diagnosis, but may testify regarding a claimant's symptoms and activities of daily living. *Id.*

Lay witness testimony as to a claimant's symptoms or how an impairment affects her ability to work is competent evidence which the ALJ must take into account. *Id*; *see also Dodrill v. Shalala*, 12 F3d 915, 919 (9th Cir 1993). However, testimony about the causes of a claimant's medical problems, such as a serious mental impairment as the result of a stroke, is beyond the competence of a lay witness and is not competent evidence. *Vincent v. Heckler*, 739 F2d 1393, 1394-95 (9th Cir 1984). Inconsistency with medical evidence is a germane reason sufficient to discredit lay witness testimony. *Bayliss v. Barnhart*, 427 F3d 1211, 1218 (9th Cir 2005).

**B. Ms. Cook**

A mental health therapist is evaluated as an "other," or non-medical, evidentiary source. 20 CFR § 416.913(d); SSR 06-03p at * 2, 2006 WL 2329939 at * 2 (Aug 9, 2006). Information from "other sources" cannot establish the existence of a medically determinable impairment since there must be evidence from an "acceptable medical source" for this purpose. "However, information from 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p at * 2.

With respect to Ms. Cook, the ALJ stated that she "noted that [Thom] had not been consistent in attending ongoing therapy sessions." and "found that [her] prognosis was fair, if she pursued treatment." Tr. 35. Thom argues that this summary omits relevant evidence and misstates the record. She is correct.

Ms. Cook's treatment notes state as follows:

> It is possible that her use of alcohol will continue until she receives
> effective treatment for 'the voices.' . . . . Carrie, so far, has not

> been able to consistently make her appointments.  This could be an
> issue in consistent, ongoing treatment.  Her prognosis is fair,
> looking at her past history of starting and stopping therapy.  If she
> could find an effective treatment for the voices, it would be most
> helpful to her."

Tr. 208.

The only fair reading of these notes is that Thom was seeking effective treatment for her auditory hallucinations, but had been unsuccessful in finding something that worked.  In contrast, the ALJ's summary implies that Thom was not pursuing treatment, a conclusion which cannot be logically or rationally inferred from the record.

### C.  <u>Warnicke and Costello</u>

The ALJ acknowledged that Thom has severe mental impairments which account for some of the symptoms described by Warnicke, but "the full medical record does not document the frequency or intensity of such symptoms occurring on a regular basis."  Tr. 39.  Although the medical record may not completely document the frequency or intensity of Thom's symptoms, it certainly does support regular treatment for them.  Based on his opportunity to personally observe Thom, Warnicke's testimony is consistent with the medical record and adds further corroborating details.  The ALJ gives no cogent reason for ignoring that additional evidence.

The Commissioner notes inconsistencies between Warnicke who described Thom as socially isolated and Costello who testified that Thom spends time with friends away from home.  However, these two reports of Thom's social activities are not inconsistent.  Warnicke noted that Thom allows only a select few around her, and Costello described Thom visiting with only a few friends.  Thom's social anxiety is also supported by the record, as Drs. Anderson, Greene, and

Reed, and Ms. Cook all diagnosed her with panic disorder with agoraphobia.  Tr. 207, 217, 234, 297.  Absent any other germane reason to reject Warnicke's personal observations of Thom, the ALJ erred.

The ALJ did not expressly reject Costello's testimony, but noted only her lack of knowledge as to Thom's methamphetamine use (Tr. 33).  Costello's ignorance of Thom's positive methamphetamine drug test is not enough to discredit her statements considering the context of that drug test.  Thom was hiding her cutting behavior generally from her mother, and the positive drug test occurred while she was being treated for this behavior.  Moreover, the ALJ appears to have accepted Costello's testimony in part to contradict Thom's testimony of alcohol abstinence and (Tr. 38) and inability to leave the house due to anxiety (Tr. 33).  The ALJ's opinion does not explain why she accepted Costello's testimony in part, yet apparently rejected her personal observations of Thom hearing and being distracted by voices, which are auditory hallucinations symptomatic of her diagnosed psychotic mental disorder.  Absent any statement of reasons germane to Costello for not considering that testimony, the ALJ erred.

## IV.  Vocational Expert

At step five, the Commissioner must show that the claimant can do other work which exists in the national economy.  *Andrews v. Shalala*, 53 F3d 1035, 1043 (9th Cir 1995).  The Commissioner can satisfy this burden by eliciting the testimony of a VE regarding the jobs the claimant would be able to perform, given her RFC.  *Tackett*, 180 F3d at 1101.  An ALJ must propose a hypothetical that sets forth all the limitations and restrictions that are supported by substantial evidence.  *Roberts v. Shalala*, 66 F3d 179, 184 (9th Cir 1995).  The hypothetical must

be "accurate, detailed, and supported by the medical record." *Tackett*, 180 F3d at 1101. "If a hypothetical fails to reflect each of the claimant's limitations supported by 'substantial evidence,' the expert's answer has no evidentiary value." *Osenbrock v. Apfel*, 240 F3d 1157, 1167 (9th Cir 2001), citing *Gallant v. Heckler*, 753 F2d 1450, 1456 (9th Cir 1984).

Because the ALJ improperly rejected and did not include Dr. Greene's limitations in the hypothetical, the hypothetical to the VE was not supported by the record.

## V.  Remand For Further Proceedings

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F3d 1172, 1178 (9th Cir), *cert denied,* 531 US 1038 (2000); *Benecke*, 379 F3d at 593. The court's decision turns on the utility of further proceedings. A remand for an award of benefits is appropriate "where the record has been developed fully and further administrative proceedings would serve no useful purpose." *Benecke*, 379 F3d at 593 (citations omitted.). The Ninth Circuit has established a three-part test to make this determination. The court should credit evidence and remand for an immediate award of benefits when:

> (l)  the ALJ has failed to provide legally sufficient reasons for  rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman*, 211 F3d at 1178.

The second and third prongs of the test often merge into a single question, namely whether the ALJ would have to award benefits if the case were remanded for further proceedings.

*Id* at 1178 n2.  This court has some flexibility in applying the "crediting as true" rule.  *Connett v. Barnhart,* 340 F3d 871, 876 (9th Cir 2003).

As discussed above, the ALJ failed to provide legally sufficient reasons for rejecting Thom's testimony, the opinions of her treating physician, Dr. Greene, and mental health provider, Ms. Cook, and the lay witnesses, Warnicke and Costello.  Thus, that evidence should be credited as true.  *See Harman*, 211 F3d at 1179; *Smolen*, 80 F3d at 1281-83; *Varney*, 859 F2d at 1398.

Turning to the other two facets of the *Harman* inquiry, this court finds that no outstanding issues must be resolved before a determination of disability can be made and that it is clear from the record that the ALJ would be required to find Thom disabled if the evidence is credited.

Thom's attorney asked the VE to consider an individual with limitations as provided by Dr. Greene's report.  The VE concluded that a person with such limitations would not be competitively employable.  Tr. 71.  The VE further concluded that "if an individual had an intrusive mental condition that interfered with concentration, persistence, and pace regularly on a daily basis during the attempt to accomplish work like tasks, even on a lesser level than [Dr. Greene's MRFC of Thom] form is establishing, but nonetheless still intrusive and still interruptive," such a condition would erode the number of jobs in the national economy.  *Id*.

It is clear from the record that Thom is unable to perform gainful employment in the national economy.  There is no basis on which an ALJ, crediting the evidence of Thom's mental impairments, could conclude that Thom could perform any work that requires consistency and productivity.  Because the evidence establishes that Thom would be unable to maintain

employment, remand for further administrative proceedings serves no useful purpose and is unwarranted.

## **ORDER**

For the reasons discussed above, the Commissioner's decision is REVERSED and this case REMANDED pursuant to Sentence Four of 42 USC § 405(g) for the calculation and award of benefits.

DATED this 26th day of July, 2011.

s/ Janice M. Stewart_____

Janice M. Stewart
United States Magistrate Judge

32 - OPINION AND ORDER